IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| TERESA MARIE LYND, | No. 82762-6-I |
| Respondent, | |
| v. | DIVISION ONE |
| JEFFERY LEO LYND, | UNPUBLISHED OPINION |
| Appellant. | |

CHUN, J. — Jeffery Lynd appeals a parenting plan entered after a modification trial. He challenges the plan on a number of grounds. For the reasons below, we affirm.

## I.   BACKGROUND

Jeffery Lynd and Teresa Lynd are formerly married and share a child, D.J.L. A court dissolved Jeffery and Teresa's[1] marriage in 2017 and entered a parenting plan under which both parents had residential time with D.J.L

In 2020, Teresa petitioned to modify the parenting plan. The petition is not in the record. But it is undisputed that Teresa filed the petition based in part on what she perceived as Jeffery's "questionable boundaries" with D.J.L. and his "irrational fear" that D.J.L. had a neuromuscular condition that would lead to paralysis or death. The trial court found adequate cause for a full modification trial and appointed a guardian ad litem (GAL) for D.J.L. The court directed the

---

[1] Because the parties share a last name, we refer to them by their first names for clarity. We intend no disrespect.

Citations and pin cites are based on the Westlaw online version of the cited material.

GAL to "investigate and file a report only on . . . [a]ll issues related to making a parenting plan for [D.J.L.]," as well as "[d]omestic violence allegations about," "[m]ental health issues of," and "[s]exual abuse allegations against" Jeffery. The court also directed the GAL to investigate whether Jeffery should undergo a psychosexual evaluation and a psychological evaluation. Meanwhile, the trial court entered a temporary parenting plan under which Jeffery would have no contact with D.J.L. except two hours of supervised visitation per week.

In May 2020, the GAL issued a report and recommendations. The GAL recommended that Jeffery undergo a psychosexual evaluation and comply with any recommended treatment. The GAL also recommended a phased parenting plan, with "Phase One" beginning after Jeffery "has commenced the treatment recommended on the basis of the psychosexual evaluation, and is able to articulate to his treatment provider an understanding of his need to work on himself and to take responsibility for his loss of parenting time." In Phase One, Jeffery would have unsupervised visits with D.J.L. on Saturday afternoons.

"Phase Two" of the recommended parenting plan would begin after Jeffery "has continued consistently in treatment and provided that [D.J.L.] is not reporting any concerning behaviors or communications" by Jeffery. In Phase Two, Jeffery's visits would extend to full days, every other Saturday.

"Phase Three" of the recommended plan would add weekend overnights and would not begin unless Jeffery remained compliant with treatment and achieved additional benchmarks with regard to parenting D.J.L.

2

In July 2020, Teresa petitioned for and obtained a one-year domestic violence protection order (DVPO) protecting Teresa and D.J.L. from Jeffery.

In January 2021, the GAL issued an updated report in which he described events that had occurred since his initial report, including events leading up to Teresa's DVPO petition.  The GAL wrote, with regard to the recommendations in his earlier report, "Unfortunately, by his own actions Jeff[ery] sabotaged any chance of those recommendations being implemented."  (Emphasis omitted.)  In his updated report, the GAL recommended that Jeffery undergo a substance use disorder evaluation in addition to the earlier recommended psychosexual evaluation.  The GAL also recommended a revised parenting plan under which Jeffery's time with D.J.L. would not, without further court approval, increase beyond nine hours of unsupervised visitation every other Saturday.

A modification trial took place in March and April 2021.  Afterward, the court made a number of written findings, including the following:

> The Court finds Father has demonstrated difficulties with boundaries including things like purchasing of clothing that may not be age appropriate for the child and his unwillingness to establish boundaries regarding sexualized behavior by the child. . . .

> The father lacks insight into appropriate behavior with children as evidenced by all the testimony but, more specifically, the testimony of his stepdaughter and the father's cross-examination of his stepdaughter.

> The Court finds that the child has been emotionally abused by the father. . . .

> Due to the father's harassment, the child has lost trusted adults in her life such as her therapist who could no longer tolerate the abusive behavior by the father, and . . . this is a pattern of behavior and it has been established and is clearly damaging and dangerous to the child.

3

The Court finds that the father's preoccupation and repeated vocalization in the child's presence that she will die from a medical disorder with which the Court will note she has not been diagnosed by any medical professional is also emotionally harming the child.

The Court finds that Mr. Lynd suffers from a long-term emotional impairment which interferes with his performance of his parenting functions.

The Court finds that the father is highly motivated to be a good parent. However, . . . the father struggles with containing his aggression when he feels frustrated, and evidence showed that through his repeated aggressive and threatening behavior, that father has frightened the child's teachers and therapists as well as other adults involved in the child's life. . . . [T]his continued behavior has damaged the child significantly and will continue to damage the child if the behavior is not stopped, placing the child at risk for potentially irreversible emotional and physical harm.

The Court also makes findings . . . that the father has been convicted of repeated domestic violence protection order violations and a bomb threat to the courthouse within the last calendar year 2020. The father has also been convicted of domestic violence stalking and cyberstalking in May of 2020. This is further evidence that the Court relies on in making findings that restrictions are required against the father.

The trial court granted Teresa's modification petition and entered a parenting plan that largely adopted the recommendations in the GAL's updated report, including ordering Jeffery to undergo a psychosexual evaluation. The court also entered a restraining order and a DVPO protecting both Teresa and D.J.L. These orders are not in the record. But the trial court stated in its oral ruling that the restraining order would remain in effect until D.J.L. turned 18 years old, and the DVPO would have a term of "two calendar years from the time of presentation of final orders." The court also said that Jeffery could petition to lift the orders if he "is in the phase where he has complied with evaluations and treatment and is having unsupervised contact" with D.J.L.

Jeffery appeals.

4

## II.    ANALYSIS

### A.  Standards of Review

We review a trial court's parenting plan for an abuse of discretion.  In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).  We also review for abuse of discretion a trial court's evidentiary rulings and its decision whether to grant a restraining or protection order.  See In re Wagner, 18 Wn. App. 2d 588, 596, 496 P.3d 742 (2021) (evidentiary rulings); In re Marriage of Freeman, 169 Wn.2d 664, 671, 239 P.3d 557 (2010) (protection order); In re Marriage of Chua, 149 Wn. App. 147, 156, 202 P.3d 367 (2009) (restraining order).  "An abuse of discretion occurs when a decision is manifestly unreasonable or based on untenable grounds or untenable reasons."  Katare, 175 Wn.2d at 35.

A trial court's unchallenged findings are verities on appeal.  In re Marriage of Magnuson, 141 Wn. App. 347, 351, 170 P.3d 65 (2007).  And we will uphold challenged findings so long as they are supported by substantial evidence.  In re Marriage of Akon, 160 Wn. App. 48, 57, 248 P.3d 94 (2011).  "Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true."  Id.  In determining whether substantial evidence supports a trial court's finding, "'[w]e do not reweigh or rebalance competing testimony and inferences even if we may have resolved the factual dispute differently.'"  In re Marriage of Bundy, 12 Wn. App. 2d 933, 938, 460 P.3d 1111 (2020) (quoting Bale v. Allison, 173 Wn. App. 435, 458, 294 P.3d 789 (2013)).

The appellant has the burden to provide a sufficient record to review the issues raised on appeal.  Story v. Shelter Bay Co., 52 Wn. App. 334, 345, 760

P.2d 368 (1988).  So, "[i]f the party seeking review intends to urge that a . . . finding of fact is not supported by the evidence, the party should include in the record all evidence relevant to the disputed . . . finding."  RAP 9.2(b). Similarly, if a party intends to argue that the trial court abused its discretion, it must provide a sufficient record for the appellate court to evaluate the trial court's exercise of discretion.  See Story, 52 Wn. App. at 345 (trial court's decision "must stand" where appellant fails to provide a record sufficient to review it).

Jeffery challenges the parenting plan on a number of grounds.  As discussed below, each of Jeffery's challenges fails on its merits, or because he failed to preserve it or did not provide a sufficient record for review.

B.  GAL Bias

Jeffery first contends that the GAL was biased and that this bias influenced the trial court's decision.  In support, Jeffery points to his re-cross examination of the GAL, during which Jeffery asserted that the GAL "put a lot of one-sided stories from Teresa" in his report and omitted Jeffery's side of the stories.  Jeffery then asked the GAL, "Is that maybe why I came to a conclusion that you are biased in this assessment of yours because you were mostly siding on Teresa's behalf?"  After the GAL asked Jeffery to clarify the question, Jeffery asked, "Could that be maybe why a person would mistakenly think you're biased in this case?"  The GAL responded, "It could have a bearing on that, certainly."

Jeffery also points to the following exchange that came later during his re-cross examination of the GAL:

Q. Was it true that I gave you my side of the story in which [D.J.L.] left the bedroom that night, saying that she took her pants and underwear off because that's the way Mommy does it?

A. I don't recall that. I recall you saying something about a hot night, that she was overly warm. And as to my leaving that out, I can understand why you would be concerned about that. It may be an omission that I should not have – I maybe should have included it, but I will say I did not come to the conclusion that you sexually abused your daughter.

Q. But you came to the conclusion that I need a psychosexual evaluation again?

A. I think there are questions about you in terms of sexual deviancy.

The above exchanges do not establish that the GAL was biased. At most, they show that the GAL's report omitted information that Jeffery believed was relevant. The GAL did concede that his report "maybe should have included" Jeffery's perspective on an incident involving D.J.L.'s pants and underwear. But nothing in the record suggests that the omission stemmed from improper bias or that it affected the court's rulings—particularly given that the GAL did not conclude that Jeffery had sexually abused D.J.L., and Jeffery brought the omission to the court's attention during his examination of the GAL.

Jeffery also claims that the GAL "does not say one good thing about [Jeffery] in his reports" and "does not mention [Jeffery]'s six years of being a stay-at-home father," his time working for a local school district, "or that Teresa . . . called Jeff[ery] a 'very good father' at the divorce hearing in 2017." But the GAL's report does state, in the summary of information Jeffery provided, that when Teresa became pregnant with D.J.L., "they decided [Jeffery would] stay home to watch [D.J.L. and] Teresa said he was a great dad." In any event, Jeffery fails to establish that the GAL's decision to omit the foregoing information

7

from his report improperly influenced the trial court. Indeed, as the trial court pointed out during Jeffery's examination of the GAL, Jeffery would have—and presumably did have—an opportunity at trial "to testify about everything from [his] perspective" so that his perspective could also be considered. Reversal is not required. Cf. In re Marriage of Black, 188 Wn.2d 114, 132-35, 392 P.3d 1041 (2017) (parenting plan constituted abuse of discretion where trial court gave GAL's testimony great weight and GAL made "several problematic statements" revealing bias against the mother, including describing the mother's sexual orientation as a "'lifestyle choice,'" improperly suggesting that controversy surrounding the mother's sexual orientation would harm the child, and recommending unconstitutional prohibitions on the mother's conduct).

C. Psychosexual Evaluation

Jeffery next says the trial court erred by ordering Jeffery to undergo a psychosexual evaluation. In support, Jeffery claims "the court found no sex crimes on [Jeffery's] background check," "[t]he court heard evidence that [Jeffery] had already passed a psychosexual evaluation many decades ago," "[t]here was no evidence of sexual abuse and the GAL did not find that [Jeffery] committed acts of sexual abuse," and "[a]ny testimony regarding sexual deviancy was contradicted by [Jeffery]'s own testimony."[2]

Jeffery has not provided a sufficient record for us to review this claim of error. The trial court determined that a psychosexual evaluation was warranted

---

[2] Jeffery also contends the trial court abused its discretion because it refused to admit polygraph results as evidence that Jeffery did not sexually abuse D.J.L. We address this contention separately below.

based on the GAL's report and the testimony at trial. Yet even though the modification trial took place over four days, Jeffery designated only some of the trial testimony—his cross and re-cross examinations of the GAL—for the appellate record. Without knowing what other relevant testimony may have been before the trial court, we cannot evaluate Jeffery's claim that the evidence could not support a determination that a psychosexual evaluation was appropriate. So we also cannot conclude that the trial court abused its discretion by ordering the evaluation.

D. Emotional Abuse Finding

The trial court found that D.J.L. had "been emotionally abused" by Jeffery based on "testimony presented and Exhibit 1 as well as Exhibit 10." Exhibit 10 is a copy of a healthcare provider's "after visit summary" indicating that D.J.L. was "affected by Munchausen's syndrome by proxy." Jeffery contends that because the trial court erred by admitting Exhibit 10, the trial court's emotional abuse finding was in error.

But "[e]rror may not be predicated upon a ruling which admits . . . evidence unless . . . a timely objection . . . is made." ER 103(a)(1). And Jeffery concedes that Exhibit 10 "was admitted into evidence without objection." Jeffery failed to preserve his challenge to the trial court's admission of Exhibit 10.

Also, the erroneous admission of evidence merits reversal only if the error prejudiced the party opposing admission. Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wn.2d 188, 196, 668 P.2d 571 (1983). Here, the trial court expressly stated that its emotional abuse finding was based not only on

Exhibit 10 but also on the GAL's report and the testimony at trial. And as discussed, Jeffery did not designate the complete trial transcript for our review. So even assuming the trial court erred by admitting Exhibit 10, we cannot conclude, on the incomplete record before us, that the evidence was insufficient to support the trial court's determination that Jeffery emotionally abused D.J.L.

E. Exhibit 140

Exhibit 140 was a letter from a polygraph examiner to Jeffery stating that Jeffery was "not attempting deception" when he answered "no" to the question, "Have you ever molested your daughter?" Jeffery contends that the trial court erred by refusing to admit Exhibit 140 and refusing to allow the polygraph examiner to testify. But in Washington, "courts have consistently recognized [polygraph examinations] as unreliable and, unless stipulated to by all parties, inadmissible." In re Det. of Hawkins, 169 Wn.2d 796, 802, 238 P.3d 1175 (2010); see also Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 606 n.4, 260 P.3d 857 (2011) (observing that "polygraph tests have been widely excluded . . . as unreliable"). Thus, the trial court did not abuse its discretion by refusing to admit Exhibit 140 or the polygraph examiner's testimony.

Jeffery disagrees and says Exhibit 140 should have been admitted because he listed it in his ER 904 disclosure and Teresa did not object. But Jeffery did not designate his ER 904 disclosure or proof of service thereof for the appellate record. Thus, the record does not support Jeffery's assertion that Exhibit 140 was properly disclosed under ER 904.

Also, and in any event, ER 904 deems a document admissible only if (1) it is offered as provided in ER 904 and (2) it falls within the categories of documents identified in the rule. ER 904(a). Polygraph results are not specifically listed in ER 904. The rule does apply to "[a] document not specifically covered . . . but relating to a material fact *and having equivalent circumstantial guaranties of trustworthiness*." ER 904(a)(6) (emphasis added). Given that polygraphs are widely recognized as unreliable, Jeffery cannot establish that Exhibit 140 had sufficient "circumstantial guaranties of trustworthiness" to qualify for admission under ER 904, even if he properly disclosed it. Jeffery's reliance on ER 904 is misplaced.

F. Neurology Appointment

When the trial court appointed the GAL, D.J.L. had an appointment scheduled with a neurology specialist at Children's Hospital. Teresa disputed the appointment's necessity, claiming that D.J.L.'s doctors "clearly did not think anything was wrong with [D.J.L.]'s legs and made the referral to placate Jeff[ery]." In its order appointing the GAL, the trial court directed the GAL to determine whether Teresa should take D.J.L. to the neurology appointment. The GAL later testified as follows about the appointment:

> I actually think it would be a good idea to get this issue laid to rest, and if having a specialist evaluate [D.J.L.] can do that, then that would be good to have that issue eliminated as an area of conflict. Perhaps if the answer is she does not have it, then perhaps her father can stop being worried about it and then she can stop being worried about it.

The trial court did not order D.J.L. to attend the neurology appointment, and Jeffery contends this was an abuse of discretion given the GAL's testimony.

But because Jeffery has not provided a complete record from the modification trial, we do not know—and cannot evaluate—the basis for the trial court's decision not to require D.J.L. to attend the neurology appointment. Also, "[t]rial courts have broad discretion and are not bound by GAL recommendations." Magnuson, 141 Wn. App. at 350. Here, the trial court made unchallenged findings that D.J.L. was being emotionally harmed by Jeffery's "preoccupation and repeated vocalization in [D.J.L.]'s presence that she will die from a medical disorder" and that D.J.L. "has not been diagnosed by any medical professional" with such a disorder. Given the incomplete state of the record before us and the trial court's unchallenged findings, we cannot conclude that it was manifestly unreasonable for the trial court not to order Teresa to take D.J.L. to a neurology appointment simply to put a dispute between her parents to rest.

G. Evidence of Pre-Dissolution Events

Jeffery points out that the GAL's reports described events before the parties' dissolution, when the original parenting plan was entered. He contends that the court erred to the extent it considered events that took place before the dissolution. But Jeffery cites no authority to support his assertion that the trial court was not allowed to consider evidence of pre-dissolution events. To the contrary, a parenting plan modification may be based either on facts that have arisen since the prior plan or on *"facts that . . . were unknown to the court at the time of the prior decree or plan."* RCW 26.09.260 (emphasis added). Jeffery

12

does not specify the pre-dissolution events he claims the trial court erroneously

considered, much less show that those events were known to the court at the

time of the parties' dissolution. Thus, Jeffery fails to establish error.

H. Alcohol Assessment

Jeffery asserts that the GAL's testimony at trial "shows that the GAL knew

that [Teresa] had an issue with alcohol but he chose not to recommend an

alcohol assessment or look into this for the best interest of the child." He asserts

the trial court, too, "knew that [Teresa] had an issue with alcohol." Thus, Jeffery

contends, "the court abused its discretion by not ordering an alcohol assessment

for . . . Teresa."

But the excerpts of the record on which Jeffery relies establish only that he

claimed during an interview with the GAL that Teresa had an issue with alcohol.

They do not, as Jeffery contends, establish that the GAL and the court "knew"

that Teresa in fact did. Jeffery says that the GAL had a duty to further investigate

on account of D.J.L.'s best interests and that, by not doing so, the GAL failed in

his duty under GALR[3] 2(g) to "make reasonable efforts to become informed

about the facts of the case and to contact all parties." But the record reflects that

the GAL did engage in reasonable efforts to investigate Jeffery's claim.

Specifically, the GAL reported:

> Jeff[ery] contends that Teresa has a chronic problem with abuse of
> alcohol. He pointed out to me that Teresa got a DUI shortly before
> they married. Because of concerns raised by Jeff[ery], [Child
> Protective Services] asked [D.J.L.] about Teresa's drinking and
> whether her behavior changed when she drank, to which [D.J.L.]

---

[3] Guardian Ad Litem Rules.

13

said it didn't change. [Teresa's older daughter] said her mom's drinking is not a problem for anybody and caused no difficulties. [D.J.L.'s therapist] has no information that corroborates Jeff[ery]'s concern about Teresa's consumption of alcohol. According to [Teresa's therapist], in November Teresa reported that she had stopped drinking. When asked, Teresa indicated she typically drank one to two glasses of wine per evening. Apparently she resumed use of alcohol after that, but there does not appear to be evidence to support restrictions against Teresa in the parenting plan based on her use of alcohol or other substances.

Jeffery cites no authority supporting the proposition that, to satisfy his duty under GALR 2(g), the GAL also had to recommend an alcohol assessment for Teresa, much less that the trial court abused its discretion by not ordering one.

## I. Emotional Impairment Finding

Jeffery next challenges the trial court's finding that Jeffery "suffers from a long-term emotional impairment which interferes with his performance of his parenting functions." Jeffery asserts that "all of his mental health problems are situational and only happened after the court took away his child." Jeffery also points to a report from his primary clinician stating that although Jeffery "does display some impulsive behaviors that are non-episodic and are directly related to situational stressors and difficulty managing anger," those behaviors "have not met criteria for a Bipolar Disorder." And he asserts that he was a stay-at home father to D.J.L. until December 2019 and that during their 2017 dissolution, Teresa called Jeffery a "'very good father.'"

But as discussed, we do not reweigh or rebalance competing testimony in reviewing whether the evidence can support a trial court's finding, even if we would have resolved the factual dispute differently. Bundy, 12 Wn. App. 2d at 938. So the fact that there may have been evidence weighing against a finding

that Jeffery had a long-term emotional impairment does not mean the evidence could not support that finding. Jeffery does not establish, on the record before us, that the trial court erred in making that finding.

J. DVPO and Restraining Order

Finally, Jeffery says the trial court erred by entering a DVPO and restraining order protecting D.J.L. He points out that before the trial court announced its oral ruling on the parenting plan modification, Teresa inquired, "I was curious if following the decision [the court] will discuss the additional motions that I brought." Teresa said that she had filed three motions: one "to restrict abuse of litigation," one for "renewal of the protection order for five years for [D.J.L.] and [me]," and one "to ask for permission for [D.J.L.]'s name change." The trial court responded that it would not be addressing Teresa's additional motions and the only issues before it were "the issues that were litigated in [Teresa's] petition for the modification." According to Jeffery, the court's response means that issues related to the DVPO and restraining order were not litigated during the modification trial, and thus the trial court erred by entering those orders.

But the trial court later stated, while announcing its ruling, that Teresa had requested protection orders in her petition to modify the parenting plan. It also found that Jeffery had reasonable notice of Teresa's request and an opportunity to be heard at the modification trial. And it found that Jeffery "presents a credible threat to the physical safety of the protected people." In short, the limited record before us indicates that the issue of protection orders was litigated. Jeffery does

15

not persuade us that these issues were not properly before the trial court just because the court declined to entertain a separate, arguably redundant motion to renew the DVPO. Cf. RCW 26.09.050(1) (dissolution court has broad discretion to "make provision for any necessary continuing restraining orders"); Hough v. Stockbridge, 150 Wn.2d 234, 236, 76 P.3d 216 (2003) (court sitting in equity can fashion broad remedies to do substantial justice, including by issuing a protection order "even in the absence of a petition requesting that relief, as the facts of the relationship between the parties may warrant").

Jeffery next points out that although the statutes governing DVPOs allow a court to restrain contact with both the victim "or the victim's children," RCW 26.50.060(1)(h), this "does not mean that children must mandatorily be included in every DVPO." He asserts the trial court erred by including D.J.L. in its orders "based on evidence that was clearly disputed and contradictory to [his] polygraph examination . . . , which should have been admitted into evidence." But as discussed, this court does not reweigh competing evidence. And also as discussed, the trial court did not err by excluding Jeffery's polygraph results. Jeffery does not establish the trial court abused its discretion by including D.J.L. in its orders.

Lastly, Jeffery points out that under RCW 26.50.060(2), "[i]f a protection order restrains the respondent from contacting the respondent's minor children the restraint shall be for a fixed period not to exceed one year." But the very next sentence of that statute makes the one-year limitation inapplicable "to orders for

protection issued under chapter 26.09," i.e., the statutory chapter governing parenting plan modifications.  RCW 26.50.060(2).

We affirm.

_Chun, J._

WE CONCUR:

_Andrus, A.C.J._     _Appelwick, J._