227 P.3d 297 (2010)
154 Wash.App. 279
Janet LANE, Appellant,
v.
HARBORVIEW MEDICAL CENTER, Respondent.
No. 61774-5-I.
Court of Appeals of Washington, Division 1.
February 1, 2010.
*298 Stephen Kolden Strong, Dewelle Ellsworth, Stephen Kirk Festor, Bendich Stobaugh & Strong PC, Seattle, WA, for Appellant.
Helen Arntson, Attorney General's OfficeUW Division, Seattle, WA, Charles Kenneth Wiggins, Wiggins & Masters PLLC, Bainbridge Island, WA, for Respondent.
APPELWICK, J.
¶ 1 Lane appeals the order of summary judgment dismissing her claim against Harborview under the employee misclassification act, chapter 49.44 RCW. As a per diem nurse, Lane committed to work only a given four week period at a time. Harborview did not guarantee employment for that period or any period thereafter. A classified nurse makes a commitment to work a certain amount of hours per week on a permanent basis, and Harborview guarantees to that classified nurse that she will be scheduled and compensated for those hours. Because the commitments between Lane and the employer were objectively different from the commitments between a part-time classified nurse and the employer, Lane was not misclassified. We affirm.

FACTS
¶ 2 From 1998 to 2007, Janet Lane worked as a per diem Registered Nurse II (RN II) at Harborview Medical Center.[1] In 2007 she applied for and accepted a job as a RN II classified nurse. Her misclassification suit against Harborview alleges that she was misclassified as a per diem nurse from 1998-2007, because her actual work circumstances during that timeframe demonstrated she was a part-time classified nurse. Specifically, she points to the fact that she worked more hours than some of the part-time classified nurses throughout her term of employment *299 as a per diem. Per diem nurses and classified nurses with the same classification (e.g., RN II) perform the same core duties. It is undisputed that while Lane had the same responsibilities as a classified RN II, Harborview afforded her a different wage and benefit package.
¶ 3 The collective bargaining agreement (CBA) in place during the timeframe in question defines three classes of nurses: (1) full-time nurses, who are regularly scheduled to work forty hours in a seven day period, or eighty hours in a fourteen day period; (2) part-time nurses, who are regularly scheduled to work a minimum of twenty hours in a seven day period, or forty hours in a fourteen day period, and receive prorated salaries and benefits as provided in the civil service rules, title 357 WAC; and (3) per diem nurses, who are temporary University of Washington employees not covered under the provisions of the civil service rules or the CBA. The CBA provides that per diem nurses "may be used for the purpose of providing coverage during periods when regular staff are on leaves . . . [and] to provide coverage for recruitment of vacancies, orientation periods and fluctuations in census."[2]
¶ 4 The principal structural difference between the positions of classified nurse and per diem nurse is the nature of the commitments required on the part of both Harborview and the nurse. This is reflected in the scheduling priority each category receives, in how much and when the nurses work, and in how the nurse manager schedules the categories of nurses.
¶ 5 Dana Hermann, the assistant director of patient care services administration, explained in her declaration the schedule commitment that defines the categories of nurses. A classified nurse is hired for a shift (i.e., day, evening, rotating), a shift length, and a full-time equivalent (FTE). That nurse works a fixed full or partial schedule based on the shift and shift length for which she has been hired. A classified nurse must work the committed hours within a pay period to fulfill the FTE for Harborview to meet its budgeted staffing levels. Classified nurses may submit a request to work a particular pattern of days within their FTE and shift assignment. A classified nurse wishing to change any aspect of her schedule must submit the request, and these change requests will be granted to the extent the schedule permits or when a shift or shift length becomes available.
¶ 6 In contrast to the scheduling strictures for classified nurses, Harborview's per diem policy specifies that per diem nurses, within certain guidelines, determine how much and when they work. Per diem staff submit availability sheets for four weeks at a time, five weeks prior to the start of the four week schedule. The minimum work requirement is 48 hours per four week period. Neither the per diem policy nor the per diem nurse info sheet specifies a maximum number of hours. In fact, registered nurses are specifically exempted from the yearly 950 hour limit to which all other University of Washington temporary staff are subject.
¶ 7 Cathleen Brown, the assistant nurse manager for Harborview's operating room, explained the scheduling process in her declaration. She is responsible for preparing the four week schedule, which she completes approximately a month ahead of time. Brown begins by populating the schedule with the classified nurses, who have each committed to a fixed full or partial schedule. She then assigns classified nurses with varied or rotating schedules as needed. If classified nurses have requested leave, she grants those requests if they are compatible with staffing needs. Once she has put the classified nurses into the schedule, she assigns shifts to the travelers.
¶ 8 Finally, Brown consults the availability sheets that each per diem nurse has submitted. On these sheets, the per diem nurses have indicated their availability for the upcoming four week scheduling block. If an opening in the schedule fits with a shift a per diem nurse has indicated on her availability *300 sheet, Brown assigns the shift to that per diem nurse. Once scheduled by a nurse manager, the per diem staff is expected to honor the commitment with the exception of illness or serious emergency. Harborview does not guarantee a minimum or maximum number of annual work hours.
¶ 9 Lane sued Harborview under the misclassification act, chapter 49.44 RCW, seeking as her remedy the benefits afforded to classified nurses under the CBA. The trial court granted summary judgment in favor of Harborview on the issue of whether Harborview had misclassified Lane as a per diem nurse instead of a classified nurse. The trial court also denied Lane's motion for partial summary judgment on the same misclassification issue.[3] Lane seeks review of both the order denying her motion for partial summary judgment and the order granting Harborview's motion for summary judgment.

DISCUSSION

I. Evidentiary Questions

¶ 10 We review de novo evidentiary decisions made in conjunction with an order on summary judgment. Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998).
¶ 11 Lane submitted a short declaration in opposition to Harborview's motion for summary judgment. Harborview moved to strike portions of Lane's declaration. Lane contends the court erred when it struck the statements in her declaration that she received less pay and fewer benefits than regular nurses and when it struck the statements about nurse scheduling.
¶ 12 Responses by an adverse party to a motion for summary judgment must be made on personal knowledge, must set forth facts that would be admissible in evidence, and must show affirmatively that the declarant of such facts is competent to testify to the matters stated therein. CR 56(e); Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 359, 753 P.2d 517 (1988). A plaintiff may not defeat summary judgment by relating conclusions, allegations, or speculations. Id. at 359-60, 753 P.2d 517.
¶ 13 Lane did not show she was competent to compare the benefits. In her deposition, she specifically stated she did not know what the classified nurses were making. The trial court did not err in striking Lane's statements comparing per diem benefits with classified benefits.
¶ 14 While Lane's experience provides her some functional understanding of the scheduling process, she is ultimately not competent to describe the overarching scheduling scheme or the rationale behind it. She has no responsibility for scheduling, other than submitting her availability sheet to the nurse manager in advance of the four week scheduling block. The trial court did not err in striking Lane's statements concerning how nurse scheduling occurs.
¶ 15 Lane also contends the trial court erred by striking the letter Lane's counsel wrote to Harborview before she filed suit. The letter requested Harborview to classify Lane as a part-time classified nurse. Harborview objected on the grounds that the letter was hearsay, that there was no proper testimonial sponsorship and no authentication, that it was irrelevant, and that it was inadmissible under ER 408. The trial court agreed.
¶ 16 The parties' discussion of ER 408 is inapposite. ER 408 governs the admissibility of settlement offers and, by its own terms, does not concern other types of communication between parties ("evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount."). The letter asked Harborview to reclassify Lane as a permanent employee. It was not a settlement offer.
*301 ¶ 17 Lane further argues it should have been admitted to show that Harborview had no internal procedure by which a misclassified employee could obtain reclassification and to show that she attempted to obtain reclassification before bringing suit. The letter is not relevant to the analysis of either of the two elements of Lane's misclassification claimwhether her objective work circumstances were those of a classified nurse, or whether Harborview classified her as a per diem to deprive her of benefits. RCW 49.44.170(1)(a), (2)(d). The trial court properly excluded the three pieces of evidence in question.

II. Summary Judgment

¶ 18 We review summary judgment orders de novo. Hadley v. Maxwell, 144 Wash.2d 306, 310, 27 P.3d 600 (2001). When reviewing an order of summary judgment, we engage in the same inquiry as the trial court, considering the facts and all reasonable inferences from the facts in the light most favorable to the nonmoving party. Right-Price Recreation, LLC v. Connells Prairie Cmty. Council, 146 Wash.2d 370, 381, 46 P.3d 789 (2002). Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Factual issues may be decided on summary judgment "`when reasonable minds could reach but one conclusion from the evidence presented.'" Van Dinter v. City of Kennewick, 121 Wash.2d 38, 47, 846 P.2d 522 (1993) (quoting Cent. Wash. Bank v. Mendelson-Zeller, Inc., 113 Wash.2d 346, 353, 779 P.2d 697 (1989)). A declaration that contains only conclusory statements without adequate factual support does not create an issue of material fact that defeats a motion for summary judgment. Guile v. Ballard Cmty. Hosp., 70 Wash.App. 18, 25, 851 P.2d 689 (1993).
¶ 19 Issues of statutory interpretation and claimed errors of law are reviewed de novo. Meadow Valley Owners Ass'n v. St. Paul Fire & Marine Ins. Co., 137 Wash.App. 810, 816, 156 P.3d 240 (2007). The court first looks to the language to determine the meaning of a statute and give it effect if the language is not ambiguous. Cerrillo v. Esparza, 158 Wash.2d 194, 201, 142 P.3d 155 (2006). Statutes "must be construed so that all the language is given effect and no portion is rendered meaningless or superfluous." Kilian v. Atkinson, 147 Wash.2d 16, 21, 50 P.3d 638 (2002). Courts avoid reading statutes in ways that will lead to absurd or strained results. Wright v. Jeckle, 158 Wash.2d 375, 379-80, 144 P.3d 301 (2006).
¶ 20 RCW 49.44.160, the intent section of the misclassification act, provides guidance for interpreting the act:
The legislature intends that public employers be prohibited from misclassifying employees, or taking other action to avoid providing or continuing to provide employment-based benefits to which employees are entitled under state law or employer policies or collective bargaining agreements applicable to the employee's correct classification.
Chapter 155, Laws of 2002 does not mandate that any public employer provide benefits to actual temporary, seasonal, or part-time employees beyond the benefits to which they are entitled under state law or employer policies or collective bargaining agreements applicable to the employee's correct classification. Public employers may determine eligibility rules for their own benefit plans and may exclude categories of workers such as "temporary" or "seasonal," so long as the definitions and eligibility rules are objective and applied on a consistent basis. Objective standards, such as control over the work and the length of the employment relationship, should determine whether a person is an employee who is entitled to employee benefits, rather than the arbitrary application of labels, such as "temporary" or "contractor." Common law standards should be used to determine whether a person is performing services as an employee, as a contractor, or as part of an agency relationship.
¶ 21 The misclassification act provides two specific causes of action, stating that it is an unfair practice for any public employer to either "[m]isclassify any employee to avoid providing or continuing to provide employment-based *302 benefits," RCW 49.44.170(1)(a), or "[i]nclude any other language in a contract with an employee that requires the employee to forgo employment-based benefits," RCW 49.44.170(1)(b). Lane has not alleged that Harborview included language in her contract that requires her to forgo employment-based benefits, in violation of RCW 49.44.170(1)(b). Lane alleges Harborview misclassified her to avoid giving her benefits, in violation of RCW 49.44.170(1)(a). "Misclassify" is defined as "to incorrectly classify or label a long-term public employee as `temporary,' `leased,' `contract,' `seasonal,' `intermittent,' or `part-time,' or to use a similar label that does not objectively describe the employee's actual work circumstances." RCW 49.44.170(2)(d); Mader v. Health Care Auth., 149 Wash.2d 458, 475-76, 70 P.3d 931 (2003).
¶ 22 Accordingly, based on the plain language of the statute and its definitions, Lane's burden is to prove that Harborview (1) incorrectly classified her as a per diem nurse, when that label did not objectively describe her actual work circumstances, (2) to avoid providing employment-based benefits. RCW 49.44.170(1), (2)(d). Specifically, she argues that, because she worked as much as, if not more than, a classified part-time nurse, Harborview has deprived her of pay steps, vacation, sick leave, holiday pay, deferred compensation, cost of living raises, and seniority, all of which are benefits the CBA awards to classified nurses. Harborview does not dispute that Lane's salary and benefits were different from those of a part-time classified nurse. The only question then is whether Harborview misclassified Lane for the purpose of paying lesser benefits. We compare the actual work circumstances of a per diem nurse with the actual work circumstances of a classified nurse to assess whether Lane was misclassified.[4] RCW 49.44.170(2)(d). The factors noted in the intent section of the statute may help guide the analysis of whether Harborview misclassified Lane.[5]

A. Control Over The Work

¶ 23 The first factor, "control over the work," may mean a number of things in this context. RCW 49.44.160. It may mean the control over what is done, how it is done, how much is done, or when it is done. Classified and per diem nurses have the same substantive responsibilities and are subject to the same supervision of their work. Therefore, what is done and how it is done do nothing to inform the outcome.
¶ 24 However, comparing the classifications based on how many hours an employee must work and when she must work reveals a fundamental difference between per diem nurses and classified nurses. A per diem nurse commits to work only for specified days within a given four week period. The per diem nurse decides whether to work in that capacity for a short period or for multiple *303 years, working either continuously or intermittently. Harborview does not control these decisions at all. Accordingly, Harborview schedules per diem nurses on an as-needed basis and compensates only for actual hours worked. At all times, Lane was free to set her availability for the four week scheduling period.[6] Classified nurses lacked this prerogative. Harborview could not and did not schedule Lane for hours outside those Lane identified. In fact, Harborview had no obligation to schedule Lane to work at all.
¶ 25 On the other hand, a classified nurse makes a commitment to work a certain number of hours per week on a permanent basis, and Harborview guarantees to that classified nurse that she will be scheduled and compensated for those hours. Stemming from this difference in the respective employee/employer commitments and the requirements of the CBA, Harborview gives classified nurses scheduling priority.
¶ 26 Construing all the facts in a light most favorable to Lane, as we must, the facts nonetheless require us to conclude that the control a per diem nurse has over her work is substantially greater than a classified nurse. The control over work factor establishes a valid distinction to support Lane's classification as a per diem nurse.

B. Length of the Employment Relationship

¶ 27 The other statutory factor, "length of the employment relationship," encompasses the term of the contractual commitments of the parties, as well as the overall length of the parties' employment relationship. RCW 49.44.160. Harborview confirmed that, from 1998-2007, Lane's hours as a per diem averaged 71 percent FTE on a monthly basis. The hours Lane worked exceeded the minimum work schedule required of a part-time classified nurse. Lane argues that her actual hours of work (averaging more than a part-time classified nurse) and her years of employment at Harborview are the only facts necessary to determine the nature of her employment relationship with Harborview.
¶ 28 However, Lane presented no evidence that Harborview guaranteed her any employment beyond the immediate four week schedule for which she repeatedly applied. She provided no evidence that Harborview required her to work in any particular scheduling cycle, let alone in consecutive scheduling cycles, or in excess of the minimums set for a part-time nurse. Neither has Lane provided evidence that Harborview limited her initially to applying only for a per diem position or that it required her to remain on per diem status to continue her employment. It is undisputed that there were classified nurse positions to which Lane could have applied during her employment as a per diem nurse. Harborview never denied a formal application from Lane to be hired as a classified nurse. When she did apply, in 2007, she was hired as a classified nurse.
¶ 29 Despite the long term relationship that developed, the undisputed facts establish that Lane chose to work on four week contracts throughout her employment as a per diem nurse. Harborview did not control her availability. She alone determined her schedule. Nor did Harborview impose a classification that was inconsistent with the scheduling commitment she made.

C. Mader v. Health Care Authority

¶ 30 Lane argues that her situation, where her per diem contract determined her benefits and salary, is similar to the situation in Mader, where faculty who signed quarterly contracts were denied benefits based on the quarterly designation. 149 Wash.2d at 461, 70 P.3d 931. Mader and Knudsen were part-time faculty at community colleges. Id. The court held that the Health Care Authority (HCA) had erred in determining that were not eligible for employer contributions to health care during the summer quarters in which they had not taught. 149 Wash.2d at 474-76, 70 P.3d 931. Mader and Knudsen alleged they met the eligibility definition of former WAC 182-12-115(4) (repealed by *304 Wash. St. Reg. XX-XX-XXX (Jan. 1, 2010)), which provides contributions to those employees who worked half time or more on an instructional year or equivalent nine month basis. Id. at 471, 70 P.3d 931. The HCA had determined that, even though the faculty had worked the equivalent of half-time or more in an instructional year, the fact that they signed quarterly contracts made them eligible for contributions under a different subsection, former WAC 182-12-115(5). Id. at 463-64, 70 P.3d 931. Subsection 5 of former WAC 182-12-115 provides that part-time faculty members employed on a quarter/semester basis are only eligible for coverage beginning in the second consecutive quarter/semester of half time employment. Id. at 464, 70 P.3d 931. Because the faculty members had not taught summer quarter classes, and were therefore not working half-time, the HCA determined that they were ineligible for benefits. Id.
¶ 31 The Supreme Court reversed, reasoning that the HCA had erred in neglecting to examine Mader's or Knudsen's actual work circumstances to determine whether either satisfied the eligibility requirements of former WAC 182-12-115(4). Id. at 476-77, 70 P.3d 931. The faculty members' actual work circumstances placed them within the ambit of former WAC 182-12-115(4), because they worked half-time or more during a year, regardless of the fact that they signed quarterly contracts. Id. at`476-77, 70 P.3d 931. The court noted that the college promised fall quarter contracts in the spring, thereby creating a continuing employment relationship. Id. at 476, 70 P.3d 931.
¶ 32 In Mader, the faculty had to sign quarterly contracts and were not offered longer contracts. See Id. at 462-63, 476-77, 70 P.3d 931. Here, Harborview did not prevent Lane from entering into a contract for a part-time or full-time classified position. In Mader, the continuity of employment was promised reciprocally one or more quarters in advance. Id. at 476, 70 P.3d 931. Here, Lane determined whether she would apply to work for the next four week scheduling period. The circumstances in Mader are not analogous to those here. Mader does not support Lane's misclassification claim.

III. Conclusion

¶ 33 The basis of Lane's misclassification claim was that the hours and term of her employment were similar to that of a part-time classified nurse. While this fact is undisputed, it is not material to the misclassification analysis in this particular context. Other genuine issues of material fact not in dispute require a conclusion that she was not misclassified. CR 56(c). On this record, Lane's objective work circumstancesspecifically, her control over her scheduleas a per diem nurse were not the same as the objective work circumstances of a classified nurse. Lane's employment classification was one of her choosing, and her choosing alone. We hold that Harborview did not misclassify Lane, and that the trial court did not err in dismissing her claim under RCW 49.44.170(1)(a).
¶ 34 We affirm.
WE CONCUR: DWYER, A.C.J., and BECKER, J.
NOTES
[1] Per diem nurses receive an hourly wage, based on the salary range established for the classification and on experience. Initially, the per diem wage was 15 percent more than the classified nurse wage to account for differences in benefits afforded to the different nurse classifications. Beginning in mid-2005, the 15 percent difference has diminished incrementally. Per diem nurses are paid only for actual hours worked. Per diem nurses are paid at time and one-half for all hours worked in excess of the daily schedule work shifta minimum of eight hours, or in excess of forty hours in a seven day work week. Per diem nurses are eligible for pay premiums, including shift differentials and standby pay.

Per diem nurses do not receive the automatic annual increments or pay adjustments that classified nurses do, but Harborview may adjust a per diem nurse's pay. Per diem nurses who have worked 2,080 hours since hire/last step increase, may, upon request, be granted step increases up to the maximum allowed. Lane requested and received step increases that brought her to the top of the salary range as a nurse.
Classified nurses receive medical and dental benefits upon beginning employment, as well as retirement benefits and disability and life insurance. Per diem nurses who have worked six consecutive months at half-time or greater are eligible for employer contributions to health plans (medical and dental), life insurance, and disability insurance. Per diem nurses may also become eligible for state retirement benefits. Lane became eligible and enrolled in the PERS-2 system.
Unlike classified nurses, who have paid sick time and leave time, per diem nurses have neither. Finally, classified nurses accrue vacation leave, from the base of twelve days for the first year, at the rate of one additional day per year.
[2] Travelers, another category of nurses, are nurses who work for short periods of time all around the country. Harborview contracts with them to work a specified number of weeks, on an established schedule within the contract period. Harborview pays the travelers regardless of whether it uses their services.
[3] Lane also argued in this motion that, even assuming proper classification, Harborview failed to provide her the correct pay step increases. However, she has not argued this issue on appeal.
[4] Lane does not allege that the per diem nurse category is a contrivance as a class; only that her actual work circumstances were those of a classified nurse.
[5] The common law the parties cite is not helpful in determining whether Lane was improperly considered a "temporary" employee. State ex rel. Cole v. Coates, 74 Wash. 35, 37-38, 132 P. 727 (1913) stands for the proposition that an employer may not fire a worker from a permanent position, change the name and pay of that position to that of a day laborer, yet still require the worker to perform exactly the same duties. The nature of the work determines the rights of the workers. Id. at 39, 132 P. 727.

Allard v. City of Tacoma, 176 Wash. 441, 442-43, 29 P.2d 698 (1934), held that Allard was entitled to a position based on seniority, where, after his layoff, a junior civil service employee received a job that required the same work that Allard had done before being laid off, although the new job had a different title. The facts in Allard are distinguishable from those here, where Lane has not alleged that she was deprived of a classified position by someone less entitled.
Finally, Petley v. City of Tacoma, 127 Wash. 459, 462-63, 221 P. 579 (1923), concerned the City of Tacoma's attempt to hire an engineer without using the civil service examination register, which it was required to do. The City argued it did not have to hire from the register, as it sought a hydraulic engineer, and the examination had tested design and construction engineers. Id. at 463, 221 P. 579. Because the substantive work of a design engineer must also be that of a hydraulic engineer, and Petley was competent to perform either, the court awarded to judgment to him. Id. at 468, 221 P. 579. While the general rule in Petley (from Coates) applies, the factual circumstances are nowhere similar enough to merit further comparison.
[6] As discussed above, there are some basic requirements for per diem nurses. The minimum work requirement is 48 hours per four week period. However, a per diem nurse may notify her immediate supervisor if she is not able to work for an entire four week period.