# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| SIMONE SCOTT, as Personal Representative of the Estate of Shamarra Scott, | No. 57335-1-II |
| Appellant, | |
| v. | |
| CITY OF TACOMA, a municipal corporation; WADE and JANE DOE WHITE, a marital community, | UNPUBLISHED OPINION |
| Respondents. | |

CRUSER, A.C.J. — Shamarra Scott's estate (Estate) sued Tacoma, arguing that a 2015 collision between Scott and a Tacoma police cruiser caused Scott's death in 2020. The Estate claims that the collision caused a flare in Scott's sarcoidosis,[1] requiring treatment with steroids that in turn caused osteoporosis[2] and spinal fractures. Scott had surgery in 2018 to treat the fractures, and later died of neurological complications after an extended period of paralysis.

---

[1] Sarcoidosis is "a chronic disease of unknown cause that is characterized by the formation of nodules especially in the lymph nodes, lungs, bones, and skin." *Sarcoidosis*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/sarcoidosis (last visited Oct. 23, 2023).

[2] Osteoporosis is "a condition that affects especially older women and is characterized by decrease in bone mass with decreased density and enlargement of bone spaces producing porosity and fragility." *Osteoporosis*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/osteoporosis (last visited Oct. 23, 2023).

The Estate's case hinges on the connection between the collision and Scott's sarcoidosis. It proffered expert testimony from Dr. Steven Overman, who opined that the collision caused Scott's sarcoidosis flare and untimely death. On a defense motion, the trial court struck Dr. Overman's testimony, finding that his opinion was based on novel science not generally accepted in the scientific community. The court then granted the City's partial summary judgment motion and dismissed the Estate's wrongful death claim.

The Estate now appeals, arguing that (1) the trial court erred when it struck Dr. Overman's testimony and that (2) even without that testimony, the remaining expert opinions created a genuine issue of material fact as to causation that should have been submitted to a jury. The City responds that (1) Dr. Overman's testimony was properly excluded and that (2) without that testimony, the Estate failed to create an issue of fact as to whether the collision caused a sarcoidosis flare.

We hold that the trial court erred in excluding Dr. Overman's testimony because Dr. Overman's opinions were based on his extensive clinical experience, not on novel scientific methods or concepts. Dr. Overman's opinions were informed by literature on similar inflammatory diseases, such as psoriasis, but the City has not shown that science to be novel. In short, the City has presented experts who disagree with Dr. Overman's causation opinions but has not shown that Dr. Overman's opinions are the type of "junk science" that *Frye* is intended to exclude.

We further hold that the trial court erred in granting the City's summary judgment motion. Having determined that Dr. Overman's opinions, including on the ultimate issue, are allowable, we conclude that genuine issues of material fact remain for the jury to decide. We reverse the trial court's decision and remand for further proceedings.

FACTS

I. PRE-COLLISION MEDICAL HISTORY

Shamarra Scott passed away in 2020 at the age of 40. Scott developed Bell's palsy[3] and iritis[4] in 2012 and was referred to Dr. Anastasia Fyntrilakis "for a workup for sarcoid." Clerk's Papers (CP) at 99. Scott's medical records indicate she had a self-reported history of psoriasis.[5] Scott's iritis responded well to steroid treatment with prednisolone eye drops. Dr. Fyntrilakis ordered a chest x-ray and various labs. The labs revealed that Scott's angiotensin converting enzyme (ACE) level was moderately elevated, a finding that was "consistent with sarcoidosis." *Id.* at 355.[6] Other labs returned normal results. Dr. Fyntrilakis also referred Scott to a pulmonary specialist, but Scott did not schedule an appointment at that time because she did not have insurance.

II. 2015 COLLISION AND IMMEDIATE HEALTH PROBLEMS

Around 8:20 AM on October 14, 2015, Officer White of Tacoma Police Department pulled out from a parking lot as Scott approached at a rate of 30 miles per hour, and the police cruiser

---

[3] Bell's palsy is "paralysis of the facial nerve producing distortion on one side of the face." *Bell's palsy*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/ Bell%27s%20palsy (last visited Oct. 23, 2023).

[4] Iritis is "inflammation of the iris of the eye." *Iritis*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/iritis (last visited Sep. 4, 2023).

[5] She had a family history of psoriasis (father), goiter (brother), Grave's disease (brother), and sarcoidosis (aunt).

[6] Dr. Fyntrilakis would later testify that in 2012, Scott's ACE was elevated to a level that was "pathognomonic for sarcoidosis." CP at 359. She did not know of anything else that could cause such an elevation. A City expert, Dr. Mohai, testified that ACE was a "soft marker" for sarcoidosis. *Id.* at 1178.

collided with the passenger side of Scott's car. Scott's frontal airbags deployed on impact and her car was towed from the scene.[7] It is not disputed that Officer White was at fault for the collision.

Scott went to the emergency room (ER) at 11:45 AM, complaining of neck pain and headache. Scott denied visual changes and eye pain and her eyes appeared normal. Scott's ER record indicates she denied hitting her head or losing consciousness, but Scott would later tell a chiropractor she hit her head on the headrest in the collision. Scott was diagnosed with neck sprain and discharged from the ER with instructions to schedule a follow up appointment with a non-emergency provider. Following discharge, Scott received chiropractic care until, in September 2016, her chiropractor believed she had returned to her pre-accident status and reached maximum medical improvement.

About a week after the collision, Scott's primary care physician noticed some prominence[8] of her eyes and referred her to Dr. Myers-Powell, an ophthalmologist. Scott saw Dr. Myers-Powell on December 9, 2015, and was diagnosed with panuveitis,[9] sarcoidosis, and glaucoma.[10] Dr. Myers-Powell's record indicates that Scott "started to have recurrent flare mid October following

---

[7] The record does not indicate where on her body Scott contacted the airbag.

[8] According to Dr. Smith, prominence could refer to protrusion or reddening of the eyes.

[9] Uveitis is "inflammation of the uvea." *Uveitis*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/uveitis (last visited Oct. 23, 2023). Panuveitis indicates uveitis that is "more universal with probably the entire orbit as opposed to one area." CP at 915.

[10] Glaucoma is "a disease of the eye marked by increased pressure within the eyeball that can result in damage to the optic disc and gradual loss of vision." *Glaucoma*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/glaucoma (last visited Oct. 23, 2023).

an MVA." *Id.* at 398. Scott was treated with prednisone for uveitis from December 2015 to September 2016. She would later restart prednisone in August 2017.

### III. HEALTH PROBLEMS BETWEEN 2018-2020

On December 1, 2018, Scott presented to the local ER with severe back pain. An MRI showed compression fractures in two of Scott's vertebrae. The ER physician noted that any fractures were "likely due to chronic steroid use." *Id.* at 244. Another provider wrote that the fractures were "thought to be [due to] steroid induced osteoporosis." *Id.* at 251.[11] Because the pain was so severe that she could not walk, Scott requested a surgical consultation.

On December 6, 2018, Scott underwent spinal fusion surgery, which involved bracing her vertebrae with internal rods. On December 9, Scott was intubated and admitted to the ICU because she had "developed acute kidney injury and encephalopathy[12] which likely is due to multifactorial etiology (sepsis, uremia, medication induced)." *Id.* at 252-53.

After repeated bouts of seizure-like episodes, Scott was sedated and transferred to Harborview's ICU on January 12, 2019. The Harborview rheumatologist noted that Scott had a "history of sarcoidosis since 2012" that manifested in "adenopathy,[13] bilateral uveitis, hand

---

[11] Dr. Mohai agreed that steroid use was linked to fractures. He disagreed, however, that Scott's fractures were steroid-induced because "several things that were also done to mitigate [the risk of] osteoporosis" including alternate-day dosing and bone strengthening medication. CP at 1185.

[12] Encephalopathy is a general term meaning "a disease of the brain." *Encephalopathy*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/encephalopathy (last visited Oct. 23, 2023).

[13] Adenopathy is a general term meaning swelling or enlargement of glandular tissue, often lymph nodes. *Adenopathy*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/medical/adenopathy (last visited Oct. 23, 2023).

arthropathy,[14] possible psoriasis with nail pitting and psoriatic arthritis, Bell['s] palsy, and elevated ACE level." *Id.* 259. Throughout her time at Harborview, she was not thought to be in active sarcoidosis.

By February 3, 2019, Scott had developed quadriparesis (also known as locked-in syndrome) meaning she was conscious but was entirely paralyzed apart from her eyes. She remained paralyzed until she died in hospice on February 11, 2020. Scott's death certificate lists Guillain-Barre Syndrome as her cause of death, and lists the following "other conditions contributing to death: chronic kidney disease, large left ischium wound, quadriparesis, long term tracheostomy, sarcoidosis, [and] seizure disorder." *Id.* at 267.

## IV. LITIGATION

Scott's Estate sued the City, bringing claims for negligence and wrongful death. In the early stages of litigation, treating providers and professional experts testified about Scott's medical conditions. Specifically, the Estate hired two experts who testified that Scott's death could be traced back to the collision. Those experts, Drs. Overman and Rai, believed that the trauma[15] of the collision triggered a flare in Scott's underlying sarcoidosis necessitating steroid treatment that weakened her bones, causing her to undergo surgery and ultimately to develop fatal complications. The City's experts, Drs. Mohai and Smith, disagreed and testified that any supposed link between

---

[14] Arthropathy is a general term meaning joint disease. *Arthropathy*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/medical/arthropathy (last visited Oct. 23, 2023).

[15] These witnesses testified to the effects of both physical and emotional trauma. However, the Estate has abandoned its argument that the testimony regarding emotional trauma should not have been excluded.

trauma and sarcoidosis was unsupported by scientific literature. Scott's treating providers endorsed some links in the causal chain but expressed doubt about others.

*A. The Estate's Experts*

Dr. Overman, an internist and rheumatologist, prepared a report[16] opining that the collision caused Scott's untimely death, in part by flaring up Scott's sarcoidosis symptoms. He was later deposed and testified the same. Dr. Rai, a pulmonary and critical care physician, also testified that Scott's death could be traced back to the collision. Specifically, Dr. Rai testified, "we can trace the cascade back to the fracture of her back, . . . which we can trace back to the osteoporosis, which we can trace back to the sarcoidosis flare-up that resulted from her auto accident." *Id.* at 556. Dr. Rai also declared,

> but for Ms. Scott's need for prolonged steroid use, she would not have had compression fractures. She would not have required emergent surgery, nor experienced rebound inflammatory response. Without these antecedent events, Ms. Scott would not have experienced failure of multiple organ systems and a prolonged painful death. In short, but for the hospitalization Ms. Scott would not have died.

*Id.* at 1325.

Dr. Overman opined in his deposition that Scott's sarcoidosis flare would not have occurred but for the physical trauma from the collision. Dr. Overman repeatedly stated he formed his opinions based on his clinical experience. For example, he explained, "over the years [I] saw a number of persons who had post-physical and emotional injury triggered, activated, lit up psoriasis. Or psoriatic arthritis, I should say." *Id.* at 196.

---

[16] In preparing his report, Dr. Overman reviewed the depositions of the treating providers as well as medical records as far back as 2003.

To the extent his opinions derived from his understanding of psoriasis, Dr. Overman testified to the similarities between psoriasis and sarcoidosis. He emphasized "the biological foundational similarity between psoriasis and sarcoidosis in terms of their immune response" as the basis for making cross-disease inferences. *Id.* at 189. He explained that sarcoidosis was "one of many, many, many inflammatory diseases that have the same -- the same clinical patterns." *Id.* at 166. And among inflammatory diseases, he emphasized that psoriasis was "30 times more prevalent than sarcoidosis with a similar pathophysiology" to explain why psoriasis and its symptoms were much better understood, both in the research and from his own experience. *Id.* at 190.

Dr. Overman went on to explain the mechanisms by which physical trauma could trigger inflammation in an individual with these diseases. By way of background, he explained that "individuals [with psoriasis] can have uveitis as one of the target organs for their inflammatory disease." *Id.* at 173. He explained, when discussing the "plausibility of physical trauma activating uveitis," that "[p]hysical traumas can disrupt or injure connective tissue, and that connective tissue then can become the site for inflammatory response." *Id.* He also explained, when asked about the mechanism by which physical trauma in a different part of the body could have reactivated Scott's sarcoidosis in her eyes, that "[a]n activation of a localized inflammatory illness can cause systemic inflammation which then can be part of the generalized flare of a systemic illness. In other words, start locally, becomes general." *Id.* at 187. Dr. Rai explained that "[i]nflammatory processes can be activated by soft tissue injury" and explained that he had seen patients whose underlying disease was activated by a car accident in his own practice. *Id.* at 553.

*B. The City's Experts*

The City proffered the testimony of Drs. Mohai and Smith, both of whom disagreed with Dr. Overman's causation opinions. Regarding physical trauma, Dr. Mohai, a rheumatologist, declared,

> Dr. Overman's opinion that physical trauma associated with the motor vehicle accident activated Ms. Scott's sarcoidosis is not generally accepted in the medical community. There is no support in the medical and scientific literature for the theory that physical trauma can activate or "flare up" underlying sarcoidosis in areas where there was no physical trauma.

*Id.* at 784-85. Dr. Smith, a neurologist and neuro-ophthalmologist, also declared, "[t]here is simply no support in the medical and scientific literature for the theory that physical trauma can activate or 'flare up' underlying sarcoidosis in areas where there was no physical trauma." *Id.* at 788.

Although the City's experts disagreed that a sarcoidosis flare in the eyes could be caused by physical trauma *outside* of the eyes, Dr. Mohai endorsed the concept that skin trauma could cause a sarcoidosis or psoriasis flare localized to where the trauma occurred. Dr. Smith opined, however, that this was not the case for Scott because Scott did not sustain any ocular trauma in the collision, or, if she did, that it was not the correct type of trauma to cause such a response. Dr. Mohai also disputed the idea that one could reliably extrapolate from psoriasis to sarcoidosis. However, he stated he was aware of "[l]iterature that discusses the link between psoriasis and sarcoidosis and how there is a significant overlap in triggers of those two conditions." *Id.* at 1198. He also endorsed the idea that "many of these autoimmune and inflammatory diseases act similarly" and, when asked specifically about sarcoidosis and psoriasis, stated "they're all different flavors of the same abnormality of our immune surveillance systems making mistakes." *Id.* at 1225.

## C. Scott's Treating Providers

Scott's treating providers expressed mixed opinions about the connection between trauma and sarcoidosis. When asked whether a car crash could cause sarcoidosis or change the course of its natural progression, Dr. Fyntrilakis testified "no" and "not that I know of," respectively. *Id.* at 1046-47.

Dr. Myers-Powell, the treating ophthalmologist, testified that in her experience, uveitis can be caused by physical trauma. She testified that when a car crash causes uveitis, the crash usually involves "head or eye trauma, whether that be airbags, steering wheel, whatever." *Id.* at 429. When asked about car crashes *not* involving head or eye trauma, Dr. Myers-Powell stated that "there's a very real possibility" such an accident could cause uveitis. *Id.* She explained that she had another patient who had an undiagnosed risk factor for uveitis, who presented with uveitis following a minor car crash, "whether that be coincidence or trigger, I don't know." *Id.*

## D. Summary Judgment Proceedings and Motion to Strike Expert Testimony

The City moved for partial[17] summary judgment on July 11, 2022, arguing that the Estate failed to create a genuine issue of material fact as to whether the collision was the legal and factual cause of Scott's death.[18] The Estate on August 1, 2022, responded that the City failed to meet its

---

[17] The motion appears to request a complete dismissal, but counsel clarified at oral argument that it sought dismissal of only the wrongful death claim.

[18] The City also argued that the Estate was estopped from claiming that the collision caused sarcoidosis and Scott's ultimate death because the Estate's representative, in a statement seeking disability insurance for Scott, disclaimed sarcoidosis as a contributing factor to her medical condition as of 2019. This argument was abandoned by the City and then ultimately rejected by the court.

burden of showing an absence of a genuine issue of material fact. The Estate attached to its response several exhibits, including highlighted copies of medical records and expert depositions.

On August 2, 2022, the City moved to strike the opinions of Drs. Overman and Rai, arguing that they were unqualified to render causation opinions relating to Scott's sarcoidosis, osteoporosis, and steroid use, and that any such opinions were based on novel science not generally accepted in the scientific community. The Estate responded that *Frye* was not implicated because Drs. Overman and Rai formed their opinions based on practical experience, not novel science.

The trial court heard arguments on August 19, 2022, regarding both the motion to strike and the summary judgment motion.

The Estate made two arguments at oral argument on the motion to strike. First, it urged that where medical records indicated that Scott's airbag deployed in the accident, a reasonable inference could be made that Scott sustained trauma to the area around her eyes. It noted that the eye is located within the head and subject to the same whiplash forces. It contended that this inference, paired with defense expert testimony agreeing that physical trauma can cause localized sarcoidosis, indicate that there is agreement that Scott's sarcoidosis could have been activated by the accident. Whether there was an eye trauma in the accident, the Estate argued, was a question of fact for the jury. Second, the Estate argued that Dr. Overman's actual methodology was the Hill

criteria,[19] which was not novel, but was applied to Scott's case to reach his opinion on causation. It argued that physicians regularly apply principles from one disease to another, and that Dr. Overman's application of concepts from other diseases to sarcoidosis was proper.

The court granted the City's motion to strike Dr. Overman's testimony, concluding that it is inadmissible under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The court's reasoning, in summary, was that sarcoidosis is rare and poorly understood, that its etiology is unknown, and that no articles or studies provided to the court said that trauma[20] can serve as the "direct cause" of a reactivation of dormant sarcoidosis, nor could Dr. Overman produce such a study or article when asked. *Id.* at 1792-93.

The court granted in part the City's motion to strike Dr. Rai's causation opinions. Specifically, it struck Dr. Rai's testimony opining that "(a) the accident caused a flare-up of sarcoidosis; (b) the accident caused issues with Ms. Scott's eyes leading to prescription of steroids; and, (c) Ms. Scott would not have passed away but for the accident." *Id.* 1721. It allowed Dr. Rai's testimony opining that "(a) steroid use caused osteoporosis resulting in compression fractures; and

---

[19] Dr. Overman described the Hill criteria as

> [nine] possible perspective[s] to be considered in making causality inferences: 1) Strength of association 2) Consistency across different populations 3) Specificity of effect 4) Temporality 5) Biological gradient 6) Plausibility 7) Coherence or there is no other explanation for causal suggestion 8) Experimental evidence 9) Analogy.

CP at 1343. Dr. Overman declared that his causal opinions relied on the following factors, which he said derived from the "broader Hill criteria":

> 1) temporal association; 2) exclusion of other probable explanations; 3) scientific reports and for prevalent conditions, controlled studies; 4) reported plausible basic science mechanisms, and finally, 5) response to therapeutic strategies that were based on these mechanisms.

*Id.* at 1339-40.

[20] The court here referred to both physical and emotional trauma.

(b) Ms. Scott would not have passed away but for the progression of disease during her 2018 hospitalization," finding no *Frye* implications in that testimony. *Id.*

Finally, the court concluded that without Dr. Overman's causation opinions, the Estate could not demonstrate a genuine issue of material fact as to whether the collision reactivated Scott's sarcoidosis. The court therefore granted the City's partial summary judgment motion and dismissed the wrongful death claim. It declined to rule on legal causation, basing its opinion solely on the Estate's failure to present evidence going to factual cause.

ANALYSIS

I. ADMISSIBILITY OF DR. OVERMAN'S TESTIMONY

The Estate argues that the trial court improperly struck Dr. Overman's testimony because *Frye* did not apply to that testimony and the testimony was otherwise allowable under ER 702. Specifically, the Estate argues that Dr. Overman's opinion was not based on novel science, but was rather a novel application of generally accepted methods. The Estate goes on to argue that Dr. Overman is well qualified and that his opinions would be helpful to jurors who may be unfamiliar with sarcoidosis. The City responds that Dr. Overman's theory was indeed novel and that he presented no literature supporting the mechanism by which he opined the crash caused a sarcoidosis flare. The City further argues that Dr. Overman's testimony would not be helpful to jurors because it is unreliable and misleading. We agree with the Estate.

*A. Legal Principles*

We review a trial court's *Frye* ruling de novo. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600, 260 P.3d 857 (2011). We also review de novo a trial court's evidentiary ruling

made in conjunction with a summary judgment ruling. *See Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998).

The *Frye* test serves to keep out "unreliable, untested, or junk science." *Anderson*, 172 Wn.2d at 606. The test requires that we exclude opinions based on novel science that is not "widely accepted in the relevant scientific community." *Id.* at 609. However, "*Frye* does not require every deduction drawn from generally accepted theories to be generally accepted. Other evidentiary requirements provide additional protections from deductions that are mere speculation." *L.M. v. Hamilton*, 193 Wn.2d 113, 129, 436 P.3d 803 (2019) (citation omitted) (quoting *Anderson*, 172 Wn.2d at 611). "[T]rial courts should admit evidence under *Frye* if the scientific community generally accepts the science underlying an expert's conclusion; the scientific community does not also have to generally accept the expert's theory of specific causation." *Id.* at 129.

*Frye* concerns arise only where expert opinions are based upon novel science. *Anderson*, 172 Wn.2d at 611. *Frye* is not implicated where an expert bases their opinion on practical experience and acquired knowledge or where an expert merely applies a non-novel theory or methodology to a particular medical condition. *State v. Ortiz*, 119 Wn.2d 294, 311, 831 P.2d 1060 (1992) (plurality opinion); *Reese v. Stroh*, 128 Wn.2d 300, 307, 907 P.2d 282 (1995). Indeed, the supreme court has stressed that "[m]any expert medical opinions are pure opinions and are based on experience and training rather than scientific data." *Anderson*, 172 Wn.2d at 610. In those cases, "[w]e require only that 'medical expert testimony . . . be based upon a reasonable degree of medical certainty' or probability." *Id.* (internal quotation marks omitted) (quoting *McLaughlin v. Cooke*, 112 Wn.2d 829, 836, 774 P.2d 1171 (1989)).

Anderson is instructive. In that case, Julie Anderson was exposed to paint fumes at work and later gave birth to a son who suffered "medical abnormalities." *Id.* at 598. Anderson's expert planned to testify that the abnormalities were caused by the paint fumes, and the trial court excluded that testimony under *Frye*. *Id.* The trial court reasoned that scientific consensus did not support the conclusion that "the specific type of birth defects at issue" could have been caused by "the specific type of organic solvents" to which Anderson was exposed. *Id.* at 605. The supreme court clarified that *Frye* does not require this type of specificity. *Id.* at 611. It emphasized that requiring " 'general acceptance' of each discrete and ever more specific part of an expert opinion" would place "virtually all opinions based upon scientific data" into "some part of the scientific twilight zone." *Id.* at 611. The supreme court reversed, finding nothing novel about the expert's theory or methods. *Id.* at 611-12.

Further, under ER 702, testimony must be excluded if it is proffered by an unqualified expert or is unhelpful to the jury. We apply ER 702 by asking first whether the witness is qualified as an expert and second whether the testimony would be helpful. *Reese*, 128 Wn.2d at 306. Testimony is helpful if it helps jurors understand "a matter outside the competence of an ordinary layperson." *Id.* at 308. Testimony is unhelpful if it is unreliable or lacks an adequate foundation. *L.M.*, 193 Wn.2d at 137.

B. Application

First, we must decide whether *Frye* applies to Dr. Overman's challenged opinions by determining if the opinions rely on novel science. As to his opinion that the collision caused a sarcoidosis flare, Dr. Overman testified that he relied on his extensive clinical experience. He explained that in his experience, trauma can cause inflammation in the body. He explained that

15

sarcoidosis is an inflammatory disease and that uveitis is an inflammatory symptom, and this has not been disputed. To the extent he drew inferences about sarcoidosis from his experience with psoriasis patients, he explained how the diseases were similar and why it would be reasonable to draw such an inference. Nowhere does the City challenge Dr. Overman's clinical observations; rather, it has presented experts who disagree about Dr. Overman's causation opinions because the exact causal link has not been documented in the literature. But that is not the test. *See Id.* at 129; *Ortiz*, 119 Wn.2d at 311; *Reese*, 128 Wn.2d at 307; *Anderson*, 172 Wn.2d at 611. The City has not shown that Dr. Overman's opinion about the collision causing a sarcoidosis flare is based on novel science, so we do not apply *Frye* analysis to that opinion.

We must also decline to apply *Frye* to Dr. Overman's opinion that the collision caused Scott's untimely death. Having determined that the first link in the causal chain is not based on novel science, we turn to whether any other links are based on novel science. The parties do not dispute that Scott presented with spinal fractures after taking steroids to treat eye inflammation. Nor do the parties dispute that steroids can cause one's bones to weaken. Indeed, contemporaneous medical records show that treating providers believed steroids were to blame for Scott's spinal fractures. Finally, it is undisputed that Scott underwent a spinal fusion surgery to treat her fractures and suffered fatal complications. The only link in the causal chain that the City challenges as based on novel science is the first one, and having determined that *Frye* does not apply to that link, we decline to apply *Frye* to Dr. Overman's opinion on the ultimate issue.

Turning to ER 702, the City has presented no argument that Dr. Overman is unqualified to present expert opinions on sarcoidosis. And it is readily apparent that his testimony would prove helpful to lay jurors because few laypersons are well versed in the nuances of conditions like

16

psoriasis and sarcoidosis. Nor is his testimony so technical that a jury would be unable to assess its reliability.

Having determined that neither *Frye* nor ER 702 precludes admitting the challenged opinions, we reverse the trial court order excluding Dr. Overman's opinion.

## II. SUMMARY JUDGMENT

*A. Legal Principles*

We review summary judgment rulings de novo, viewing the facts in the light most favorable to the nonmoving party. *Davies v. Multicare Health Sys.*, 199 Wn.2d 608, 616, 510 P.3d 346 (2022). Summary judgment is properly granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We consider only the evidence that was brought to the trial court's attention. *Davies*, 199 Wn.2d at 616; RAP 9.12.

The initial burden lies with the moving party to show there is no genuine issue of material fact. *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 183, 401 P.3d 468 (2017). After the moving party has shown an absence of evidence supporting their opponent's case, "the burden shifts to the nonmoving party to set forth specific facts that rebut the moving party's contentions and show a genuine issue of material fact." *Id.* at 183.

To rebut the moving party's contentions, the nonmoving party's response must be based on "personal knowledge, must set forth facts that would be admissible in evidence, and must show affirmatively that the declarant of such facts is competent to testify to the matters stated therein." *Lane v. Harborview Med. Ctr.*, 154 Wn. App. 279, 286, 227 P.3d 297 (2010). Conclusory statements, speculation, and argumentative assertions are insufficient to create a genuine issue of material fact. *Greenhalgh v. Dep't of Corrs.*, 160 Wn. App. 706, 714, 248 P.3d 150 (2011). A

genuine issue of material fact exists where the evidence would allow a reasonable jury to return a verdict in favor of the nonmoving party. *Zonnebloem*, 200 Wn. App. at 182-83.

"Generally speaking, expert opinion on an ultimate question of fact is sufficient to establish a triable issue and defeat summary judgment." *Strauss v. Premera Blue Cross*, 194 Wn.2d 296, 301, 449 P.3d 640 (2019). This is true so long as the opinion is not speculative, conclusory, or based on assumptions. *Id.*

*B. Application*

Having reviewed Dr. Overman's testimony carefully, and finding it grounded in his personal experience as informed by relevant literature, we hold that his opinion on causation in fact has created a triable issue of fact. The City has not presented argument showing that Dr. Overman's opinion was speculative, conclusory, or based on assumptions. *Id.* Neither has the City convinced us that we should affirm based on its alternative argument, that the causal chain is too remote and attenuated to impose liability as a public policy matter. And because the City agrees that Officer White was driving negligently when he caused the accident, a triable issue as to whether the crash caused Scott's death would allow a reasonable jury to find for Scott. We hold that the trial court erred in granting partial summary judgment and dismissing the Estate's wrongful death claim.

## CONCLUSION

We reverse the trial court's *Frye* ruling and summary judgment ruling, and remand for further proceedings.

No. 57335-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, A.C.J.

We concur:

VELJACIC, J.

CHE, J.